

FILED by _____ D.C.

NCV 1 5 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | : |
| | : |
| | : **CASE NO.   05-61903 CIV-MARRA** |
| **Plaintiff,** | : |
| | : **FINAL ORDER OF JUDGMENT BY** |
| v. | : **DEFAULT FOR PERMANENT** |
| | : **INJUNCTION, ANCILLARY** |
| **CARLOS ALEJANDRO LIBERA SAUME,** | : **EQUITABLE RELIEF, AND CIVIL** |
| **ASESORIA INVERTRUST C.A.,** | : **MONETARY PENALTY AGAINST** |
| **FORINEX INVESTMENT CORP., and** | : **DEFENDANT CARLOS ALEJANDRO** |
| **INVERTRUST, INC.,** | : **LIBERA SAUME** |
| | : |
| | : |
| **Defendants.** | : |
| | : |
| | : |
| | : |
| | : |
| | : |

## I

## <u>INTRODUCTION</u>

This matter is before this Court on the motion of plaintiff United States Commodity Futures

Trading Commission ("CFTC") seeking entry of a judgment by default for all the relief requested in

its Complaint against defendant Carlos Alejandro Libera Saume ("Libera") for his failure to appear

or otherwise defend in this cause.

This Court has considered the Complaint, the CFTC's *Motion For Statutory Ex Parte*

*Restraining Order, Expedited Discovery, Preliminary Injunction, and Other Equitable Relief*

containing sworn testimonial evidence supporting the allegations in the Complaint and the relief

requested, *Plaintiff's Motion for Final Judgment by Default for Permanent Injunction, Ancillary*

*Equitable Relief, and Civil Monetary Penalty against Carlos Alejandro Libera Saume* and the

accompanying *Declaration of Ralph L. White, Jr.* setting forth evidence to accurately quantify

1

the amount of unjust enrichment obtained by Libera during the course of the fraudulent

investment scheme, and the complete record in this case.   Accordingly, the Court hereby enters

judgment by default against Libera for permanent injunction, ancillary equitable relief, and civil

monetary.

## II.

## ORDER OF DEFAULT

1.     On December 13, 2005, the CFTC filed the Complaint in this action agasint

Libera, Asesoria Invertrust C.A. ("Asesoria Invertrust"), Forinex Investment Corp. ("Forinex"),

and Invertrust, Inc. ("Invertrust").  The Complaint seeks injunctive and other equitable relief for

violations of the antifraud and exchange trading provisions of the Commodity Exchange Act, as

amended ("Act"), 7 U.S.C. § 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R.

§ 1.1 *et seq.*

2.     On December 16, 2005, Libera was served with the Complaint and this Court's

Summons by providing the Complaint and Summons to the attorney for Libera who accepted

service on behalf of Libera, both individually and as an officer of Asesoria Invertrust, Forinex,

and Invertrust.

3.     Defendant Libera has not filed an answer to the Complaint and he has not

otherwise appeared before this Court to defend in this cause.

4.     Defendant Libera is neither an infant nor incompetent person, and is not eligible

for relief under the *Soldiers' and Sailors' Civil Relief Act of 1940* (50 U.S.C. Appendix, § 501 *et

seq.*).

5.     No appearance has been entered by counsel on behalf of defendant Libera.

6.     The Clerk of the Court has entered a default against defendant Libera pursuant to

Fed. R. Civ. P. 55 based on his failure to appear in this proceeding.  Accordingly, as set forth

below, the Court makes findings that the allegations in the Complaint as to defendant Libera are deemed admitted based on his failure to appear or defend in this proceeding, makes findings of fact based on the allegations in the Complaint as to defendant Libera, and makes conclusions of law based on the allegations in the Complaint as to defendant Libera.  The Court further imposes a final order of default judgment against Libera for all the relief requested in the Complaint.

### III.

### JURISDICTION AND VENUE

1.       This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action against such person to enjoin such practice or to enforce compliance with the Act.

2.       Pursuant to Section 6c(a) of the Act, 7 U.S.C. §13a-1(a), this Court is empowered to grant *ex parte* restraining orders freezing assets, preserving books and records, and appointing temporary receivers to administer the orders, as well as preliminary and permanent injunctive relief for violations of the Act.

3.       Pursuant to Section 2(a)(1)(A) of the Act, 7 U.S.C. § 2(a)(1)(A), the CFTC has jurisdiction over transactions involving the offer of contracts of sale of a commodity for future delivery such as the transactions alleged herein.  Section 4(a) of the Act, 7 U.S.C. § 6(a), requires that those transactions be conducted on, by, or through a designated contract market or a derivatives transaction execution facility.

4.       The CFTC has jurisdiction over the transactions in foreign currency alleged herein.  Section 2(c)(2)(B) of the Act, 7 U.S.C. § 2(c)(2)(B), expressly clarifies the jurisdiction

of the CFTC over foreign currency futures transactions.  The Act is applicable to, and the CFTC

"[has] jurisdiction over an agreement, contract or transaction in foreign currency that is a

contract of sale of a commodity for future delivery [so long as the contract] is offered to, or

entered into with, a person that is not an eligible contract participant unless the counterparty" is

one of the six regulated entities listed in Section 2(c)(2)(B)(ii) of the Act, 7 U.S.C. § 2.

Defendants offered foreign currency futures transactions and/or agreements to persons who were

not eligible contract participants and represented that they would establish individual foreign

currency futures trading accounts to conduct futures transactions on behalf of such persons.

Contrary to these representations, defendants did not establish individual customer foreign

currency futures trading accounts and therefore no proper counterparty existed that could offer

and/or enter into foreign currency futures transactions with persons who are not eligible contract

participants, i.e., retail customers.  A substantial number, if not most, of the customers

defendants solicited to establish individual customer foreign currency futures trading accounts

were members of the retail investing public and were not eligible contract participants.

  5.  Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e), because defendants are found in, inhabit, or transact business in the Southern District

of Florida, and the acts and practices in violation of the Act have occurred within this District,

among other places.

## IV.

## **FINDINGS OF FACT**

**A.**  **Libera Controls Asesoria Invertrust, Forinex, and Invertrust**

  6.  Libera lists a residence in Coral Springs, Florida.  Libera is a controlling person

and principal of defendants Asesoria Invertrust, Forinex, and Invertrust.  Libera has never been

registered with the CFTC in any capacity.

4

7.     Libera is listed as the President and 90% shareholder of Asesoria Invertrust. Asesoria Invertrust is a corporation that has been registered in Venezuela since March 9, 1999. Asesoria Invertrust listed an office in Aventura, Florida.  Asesoria Invertrust also listed an address in Caracas, Venezuela.   Asesoria Invertrust maintained a bank account in Miami, Florida and Libera was the sole signatory on that account.  Libera had sole control over trading accounts maintained in the name of Asesoria Invertrust and controlled the operations of Asesoria Invertrust.  Asesoria Invertrust has never been registered with the CFTC in any capacity.

8.     Libera is the Director/Treasurer of Forinex.  Forinex was incorporated in the British Virgin Islands on July 30, 2001.  Libera had sole control over trading accounts maintained in the name of Forinex.  Forinex maintained a bank account in Miami, Florida and Libera was a signatory on that account.  Libera controlled the operations of Forinex.  Forinex has never been registered with the CFTC in any capacity.

9.     Libera is the sole officer and director of Invertrust.  Invertrust was incorporated in Florida on August 20, 2001.   Invertrust lists its address on corporate documents in Aventura, Florida.  Invertrust written agreements with customers list Invertrust's address as 500 East Broward Boulevard, Fort Lauderdale, Florida.  Invertrust maintained a bank account in Miami, Florida and Libera was a signatory on the account.  Libera had sole control over trading accounts maintained in the name of Invertrust.  Libera controlled the operations of Invertrust.  Invertrust has never been registered with the CFTC in any capacity.

**B.     Libera Committed Fraud In Connection
With Foreign Currency Futures Transactions**

10.     From at least December 21, 2000 to at least the filing of the Complaint, Libera, either directly or through other persons or entities either under his employ, supervision and control or acting in combination or concert with them, participated in a fraudulent scheme to

solicit retail customers throughout the United States, Venezuela, and elsewhere to send funds to bank accounts in the names of Asesoria Invertrust, Forinex, and Invertrust purportedly to open individual customer trading accounts for the purpose of engaging in foreign currency futures transactions.

11.     As part of his solicitations, Libera represented to customers that he would establish individual foreign currency futures trading accounts in the name of the customer at a bank or a trading firm and would conduct all foreign currency futures transactions on behalf of the customer.

12.     Libera solicited customers by representing that he had exceptional investment expertise and made extraordinary profits for customers by trading in the foreign currency markets.  Libera solicited persons in Venezuela and Miami, Florida to enter into written agreements with Asesoria Invertrust, Forinex, and Invertrust, promised them unusually high rates of return on their investments, and represented that he would use their funds to trade futures contracts on foreign currencies.

13.     Libera solicited customers by providing them with documents showing profitable returns purportedly achieved by customers of Asesoria Invertrust who established individual foreign currency trading accounts and authorized Libera to conduct the trading in those accounts. Libera represented to potential customers that they would achieve high returns based on the historically high profitable returns he purportedly made for customers.

14.     Libera represented to customers that he personally conducted all foreign currency futures trading for customers through his companies Asesoria Invertrust, Forinex, and Invertrust. Libera provided customers with written agreements stating that individual trading accounts would be established for customers and that Asesoria Invertrust, Forinex, or Invertrust would conduct all foreign currency trading on behalf of customers.  The written agreements also

6

represented that the funds of customers would be deposited in individual customer trading accounts at large brokerage firms.

15.    After customers executed written agreements with Libera's companies and sent him funds to open individual foreign currency futures trading accounts, Libera provided them with monthly account statements. These statements purported to show that customers had individual trading accounts established in their name, that foreign currency trading was occurring in their accounts, and that the trading had produced profits every month.

16.    Libera's oral and written representations to customers were materially false and misleading. Contrary to his representations to customers, Libera did not make profits for his customers because he did not establish individual foreign currency futures trading accounts for customers at any trading firm and did not transfer their funds to such trading accounts. Instead, Libera misappropriated customer funds and provided customers with false account statements showing fictitious trading in non-existent accounts.

17.    Libera, individually and as agent and the controlling person of Asesoria Invertrust, Forinex, and Invertrust, misappropriated customer funds by commingling those funds in bank accounts he controlled and transferring a portion of them to his personal trading accounts that he established at commodity futures trading firms in his own name and in the names of Asesoria Invertrust, Forinex, and Invertrust. Libera sustained trading losses totaling over $2.6 million, representing substantially all the funds he traded during the three-year period in which he maintained these commodity futures trading accounts.

18.    Libera also misappropriated customer funds by depositing the majority of funds, either directly or through transfers from foreign currency trading accounts he controlled, into bank accounts in the names of defendants and other entities on which he had signatory authority. Libera misappropriated those funds by using a portion for his personal use, by transferring some

funds to persons and entities unrelated to foreign currency trading, and by using a portion of funds from new customers to pay earlier customers fictitious profits in the manner of a Ponzi scheme.

### 1.     Asesoria Invertrust

#### a.     Solicitation Fraud

19.     Libera began his fraudulent scheme by soliciting persons to send funds to Asesoria Invertrust and represented that he would use their funds to engage in foreign currency futures transactions. Libera represented to prospective Asesoria Invertrust customers that he would establish individual foreign currency futures trading accounts in each customer's name at Currency Management Corporation, PLC ("CMC"), a foreign currency trading firm located in the United Kingdom. Libera further represented to prospective Asesoria Invertrust customers that he would conduct all foreign currency futures transactions in the account on behalf of the customer.

20.     Libera solicited persons to invest funds with Asesoria Invertrust by representing to potential customers that Asesoria Invertrust customers had received trading profits amounting to a 35.31% annual return in 1998 and a 41.10% annual return in 1999. During the second half of 2001, Libera represented to potential and actual customers that Asesoria Invertrust customers had received a 16.76% return in 2000 and an extraordinary 93.17% return in 2001. Libera further represented that Asesoria Invertrust customers had received profits in every month since 1998 and that customers would receive a minimum return of 2% each month. Libera represented that profits were assured because his trading expertise minimized any risk of loss.

21.     Libera provided prospective Asesoria Invertrust customers with brochures reciting the purported trading profits received by Asesoria Invertrust customers from 1998 to 2000.

These brochures state that Asesoria Invertrust customers had achieved profits of 35.31% in 1998, 41.10% in 1999, and 16.76% in 2000.

22.    Libera also provided prospective Asesoria Invertrust customers with an "Advisory and Management Agreement" ("Asesoria Agreement"). The Asesoria Agreement states that Asesoria Invertrust "will arrange for a bank or an international financial broker to keep a management account for The Client, which shall be in his name and shall be used exclusively for his transactions." The Asesoria Agreement provides that the customer gives Asesoria Invertrust financial and advisory management power to engage in foreign currency transactions through "the Forex activity lines which [Asesoria Invertrust] maintains at Currency Management Corporation PLC ["CMC"]." The Asesoria Agreement further states that Asesoria Invertrust shall receive 10% of the trading profits.

23.    Libera explained to prospective customers of Asesoria Invertrust that the Asesoria Agreement provided that Libera would establish an individual foreign currency futures trading account in the name of the customer at CMC and that Libera would handle all the foreign currency futures transactions in the account.

24.    Libera also provided some prospective Asesoria Invertrust customers with a one-page document entitled "Investments in the International Foreign Currency Markets" ("Investment Document"). The Investment Document states that the customer will automatically become involved in the international foreign exchange market upon opening an account with CMC. The Investment Document further states that a customer can access the international foreign currency market by "making a deposit as guarantee (Margin deposit) of [the customer's] investments that will allow [the customer] to participate actively and continuously in the market." According to the Investment Document, the profits from the customer's transactions will be deposited in the customer's account.

**b.      Customer Deposits**

25.      Libera established an account in the name of Asesoria Invertrust at Pinebank, N.A. in Miami, Florida ("Pinebank") in December 1998. Libera was the sole signatory on the account. The initial transactions in the Asesoria Invertrust account at Pinebank began on March 15, 1999 and financial activity continued in the account until June 30, 2003. Libera closed the Asesoria Invertrust account at Pinebank in July 2003. During this time, Libera instructed Asesoria Invertrust customers to send funds to the Asesoria Invertrust account at Pinebank and represented to them that their funds would be transferred to individual foreign currency futures trading accounts in their names at CMC.

26.      During the period December 21, 2000 through June 30, 2003, a total of $5,939,600 was deposited into the Asesoria Invertrust account at Pinebank. Of the total deposits, $1,174,044 related to transfers from a foreign currency trading account in the name of Asesoria Invertrust and a foreign currency trading account in the name of Libera at CMC, and $935,344 related to transfers between bank accounts in the name of Forinex or Invertrust. Of the remaining $3,830,212 in deposits, $3,186,912 represented initial deposits coming from various individuals and entities that were Asesoria Invertrust customers.

**c.      Misappropriation of Customer Funds**

27.      During the period December 21, 2000 through June 30, 2003, a total of $5,943,757 was disbursed from the Asesoria Invertrust account at Pinebank. Libera misappropriated virtually all these funds. Of the total disbursements, $1,920,586 were payments made to Libera, $37,000 were payments made to Libera's wife, $796,810 were payments made for personal and business expenses and salaries, $418,260 were transfers to the foreign currency trading accounts controlled by Libera in the names of Asesoria Invertrust and Libera, and $212,673 were transfers between bank accounts in the name of Forinex or Invertrust. Of the

remaining disbursements of $2,558,428, $1,930,990.73 were payments made to Asesoria Invertrust customers that Libera falsely represented were from trading profits in their individual foreign currency futures trading accounts at CMC.

28.     Instead of establishing individual foreign currency futures trading accounts for Asesoria Invertrust customers at CMC, Libera misappropriated their funds by depositing a portion of those funds in two proprietary foreign currency trading accounts he established at CMC: one in his own name and one in the name of Asesoria Invertrust ("CMC Trading Accounts"). Libera had exclusive authority over all trading and fund management for these accounts. Libera commingled the funds of Asesoria Invertrust customers in bank accounts he controlled and deposited a portion of those funds into the CMC Trading Accounts.

29.     From December 21, 2000 through February 2004, Libera conducted trading in the CMC Trading Accounts. Libera made deposits into the CMC Trading Accounts totaling over $4.4 million that he received from Asesoria Invertrust customers.   During that time, Libera used those funds to engage in foreign currency transactions and sustained net trading losses of approximately $1.9 million. Libera withdrew the remaining funds in the CMC Trading Accounts by making transfers to bank accounts under his control.

30.     Libera misappropriated a portion of Asesoria Invertrust customer funds by engaging in a Ponzi scheme. Libera misappropriated customer funds from the CMC Trading Accounts by transferring those funds to banks under his control and using some of those funds to pay customers purported high returns on their Asesoria Invertrust investments. Libera falsely represented to these customers that the payments were from profits on foreign currency futures trading when, in fact, the payments were from the funds of other customers.

31.     Libera also misappropriated customer funds that he received from Asesoria Invertrust customers by using them to pay his personal expenses and for purposes unrelated to

foreign currency trading.   Libera obtained these funds from the CMC Trading Accounts and

from bank accounts under his control into which he had deposited funds received from Asesoria

Invertrust customers.  Between December 21, 2000 and the present, Libera transferred at least $2

million to himself and his wife and paid approximately $800,000 for personal expenses and

business expenses to promote his fraudulent scheme.

### d.      False Trading Reports

32.      Libera made both oral and written misrepresentations and omissions of material

facts about the trading record of Asesoria Invertrust customers.  Libera falsely represented to

potential and actual customers that he had established individual foreign currency futures trading

accounts in their names at CMC and that those accounts were receiving profits as a result of his

trading on their behalf.

33.      Contrary to his oral and written representations to Asesoria Invertrust customers,

at no time did Libera establish individual foreign currency futures trading accounts in the names

of customers at CMC.  Instead, Libera misappropriated Asesoria Invertrust customer funds and

issued false trading reports to those customers showing fictitious trading transactions and

profitable returns.

34.      After customers executed Asesoria Agreements with Libera and gave him funds

to open individual foreign currency futures trading accounts at CMC, Libera provided them with

fraudulent monthly account statements.  Libera provided customers with individual monthly

account statements showing the purported trading in their foreign currency futures accounts and

the fictitious trading profits for the month.  Each statement identified a trading account in the

customer's name and designated an account number.  The statements showed that foreign

currency transactions had occurred, the date of the transactions, whether the position was "long"

or "short," the opening and closing price of the position, and the gain/loss of the trade.  All this

information was false because defendants never established any individual foreign currency futures trading accounts for their customers.  Further, no correlation exists between the purported profits represented on the fictitious customer account statements and the substantial losses in Libera's personal and proprietary trading accounts at CMC.

35.     In addition to disseminating false monthly trading statements, Libera provided potential customers with fraudulent documents showing that his companies had made consistent monthly profits from 1998 through the first half of 2001 amounting to large annual returns.  As previously alleged, these documents showed that Asesoria Invertrust customers had received trading profits of 35.31% in 1998, 41.10% in 1999, 16.76% in 2000, and 93.17% during the first half of 2001.  These profit percentages are fictitious because no individual foreign currency futures trading accounts were established for Asesoria Invertrust customers.  Moreover, to the extent that Libera wrongly used customer funds to engage in foreign currency transactions by depositing those funds into his proprietary trading accounts at CMC, the results of the trading were contrary to the false profit reports he gave to customers. One of those accounts, maintained in the name of Asesoria Invertrust, was not open in 1998 and the account suffered substantial trading losses between 1999 and 2001.  The other account, maintained in Libera's name, was not opened until 2000.  That account sustained trading losses of at least 100% in 2000 and trading losses of over 98% during the first half of 2001.

**2.      Forinex**

**a.      Solicitation Fraud**

36.     In or about July 2001, Libera began to solicit persons to invest funds with Forinex.  Libera represented to Asesoria Invertrust customers and potential Forinex customers that Forinex had taken over the operations of Asesoria Invertrust and that Libera would produce large profits for Forinex customers by using their funds to engage in foreign currency futures

trading. Libera represented to potential Forinex customers that he would establish individual foreign currency futures trading accounts in each customer's name at CMC and conduct all foreign currency futures transactions in the account on behalf of the customer. Libera represented to Asesoria customers that he would establish new individual foreign currency futures trading accounts in their name at CMC and transfer their funds from their individual foreign currency futures trading accounts that were established for them by Asesoria Inverturst to their new individual futures trading account established for them by Forinex.

37.     Libera solicited persons to send funds to Forinex and represented that he would use their funds to trade futures contracts on foreign currency. Libera solicited persons to invest funds with Forinex by representing to potential customers that Forinex customers had received annual trading profits between about 35% and 50% from 1998 through 2001. Libera further represented that his customers had received profits in every month since 1998 and that customers would receive a minimum return on their investment of 2% each month. Libera represented that profits were assured because his trading expertise minimized any risk of loss.

38.     Libera provided some prospective Forinex customers with brochures reciting the purported trading profits received by Forinex customers from 1998 through 2001. These brochures state that Forinex customers had received trading profits of about 36% in 1998, 45% in 1999, 50% in 2000, and 35% in 2001.

39.     Libera provided prospective Forinex customers with an "Advisory and Management Agreement" ("Forinex Agreement"). The Forinex Agreement states that Forinex "will arrange for a bank or an international financial broker to keep a management account for The Client, which shall be in his name and shall be used exclusively for his transactions." The Forinex Agreement provides that the customer gives Forinex financial and advisory management power to engage in foreign currency transactions through "the Forex activity lines which

[Forinex] maintains at Currency Management Corporation PLC ("CMC"). The Forinex Agreement further states that Forinex shall receive 10% of the trading profits.

40.     Libera explained to prospective customers of Forinex that the Forinex Agreement provided that Libera would establish an individual foreign currency futures trading account in the name of the customer at CMC and that Libera would handle all the foreign currency futures transactions in the account.

### b.     Customer Deposits

41.     In September 2001, Libera established an account in the name of Forinex at Pinebank. Libera was a signatory on the account. All deposit and withdrawal activity in the Forinex account at Pinebank occurred between September 6, 2001 and May 30, 2003. Libera closed the Forinex account at Pinebank in July 2003. During this time, Libera instructed Forinex customers to send funds to the Forinex account at Pinebank and represented to them that their funds would be transferred to individual foreign currency futures trading accounts in their names at CMC.

42.     During the period September 6, 2001 through May 30, 2003, a total of $5,845,491 was deposited into the Forinex account at Pinebank. Of the total deposits, $167,340 related to transfers between bank accounts in the name of Asesoria or Invertrust. Of the remaining deposits of $5,678,152, $5,451,853.80 represented initial deposits by individuals and entities that were Forinex customers.

### c.     Misappropriation of Customer Funds

43.     During the period September 6, 2001 through May 30, 2003, a total of $5,820,950 was disbursed from the Forinex account at Pinebank. Libera misappropriated virtually all of these funds. Of the $5,820,950 total disbursements, $912,500 were payments made to Libera, $33,800 were payments made to Libera's wife, $79,018 were payments made for personal and

business expenses and salaries, and $1,271,926 were transfers between bank accounts in the name of Asesoria or Invertrust. Of the remaining disbursements of $3,523,706, $2,614,540.78 represented payments made to Forinex customers. Libera falsely represented to Forinex customers that these payments were from trading profits in their individual foreign currency futures trading accounts at CMC.

44.    Contrary to his oral and written representations to Forinex customers, at no time did Libera establish individual foreign currency future trading accounts in the names of customers at CMC. As previously alleged, Libera only maintained a trading account in his name and an account in the name of Asesoria Invertrust at CMC and used those accounts to misappropriate customer funds. No funds were transferred from the Forinex account at Pinebank to CMC.

45.    Libera misappropriated customer funds by transferring a small portion of those funds to his proprietary trading accounts at Gain Capital, Inc. ("Gain"), a futures commission merchant registered with the CFTC in Warrenton, N.J. In May 2003, Libera established three foreign currency trading accounts in the name of Forinex at Gain in May 2003. Libera was the only authorized trader for these accounts and had sole control of the funds in the account.

46.    Liberia conducted virtually no trading in the Forinex accounts at Gain. Libera conducted trading in the Gain Forinex accounts only during May 2003. Only $10,000 was deposited in each of the three accounts and the accounts sustained a cumulative trading loss of $1,656.89. Libera withdrew the remaining funds of $28,339.60 and transferred them to bank accounts under his control.

47.    Libera misappropriated a portion of Forinex customer funds by engaging in a Ponzi scheme. Libera misappropriated these customer funds by transferring them from the Asesoria Invertrust account and his personal account at CMC to banks under his control and

using some of those funds to pay Forinex customers purported high returns on their investment. Libera falsely represented to Forinex customers that the payments were from profits on foreign currency trading when, in fact, the payments were from the funds from other customers.

48.     Libera also misappropriated customer funds that he received from Forinex customers by using them to pay his personal expenses and for purposes unrelated to foreign currency trading.  Libera obtained these funds from his personal trading accounts, the Asesoria Invertrust CMC trading accounts, and bank accounts under his control into which he had deposited funds received from Forinex customers.

### d.     False Trading Reports

49.     Libera made both oral and written misrepresentations and omissions of material facts about the trading record of Forinex customers.  Libera falsely represented to potential and actual customers that he had established individual foreign currency futures trading accounts in their names at CMC and that those accounts were earning profits as a result of his profitable trading on their behalf.

50.     Contrary to his oral and written representations to Forinex customers, at no time did Libera establish individual foreign currency futures trading accounts in the names of customers at CMC.  Instead, Libera misappropriated Forinex customer funds and issued false trading reports to those customers showing fictitious trading transactions and profitable returns.

51.     After customers executed Forinex Agreements with Libera and gave him funds to open individual foreign currency futures trading accounts at CMC, Libera provided them with fraudulent monthly account statements.  Libera provided customers with individual monthly account statements showing the purported trading in their foreign currency futures accounts and the fictitious trading profits for the month.  These monthly statements contained virtually the identical information that was contained in the false monthly statements received by Asesoria

17

customers. Each statement identified a trading account in the customer's name and designated an account number. The statements showed that foreign currency transactions had occurred, the date of the transactions, whether the position was "long" or "short," the opening and closing price of the position, and the gain/loss of the trade. All this information was false because defendants never established any individual foreign currency futures trading accounts for their customers. Further, no correlation exists between the purported profits represented on the fictitious customer account statements and the substantial losses in Libera's personal and proprietary trading accounts at CMC.

52.     In addition to providing Forinex customers with false monthly trading statements, Libera provided potential Forinex customers with fraudulent documents showing that his companies had made consistent monthly profits from 1998 through 2001 amounting to large annual returns. As previously alleged, these documents showed that Forinex customers had received trading profits of about 36% in 1998, 45% in 1999, 50% in 2000, and 35% in 2001. These profit percentages are fictitious because no individual foreign currency futures trading accounts were ever established for Forinex customers.

53.     To the extent that Libera wrongfully used customer funds to engage in foreign currency transactions by depositing those funds into his proprietary trading accounts, the results of the trading were contrary to the false reports he gave customers. Libera did not establish any trading accounts in the name of Forinex between 1998 and 2001 and maintained three trading accounts in the name of Forinex for only one month in May 2003 in which he sustained trading losses on total deposits of $30,000. Libera maintained an account at CMC in the name of Asesoria Invertrust that was not open in 1998 and sustained substantial trading losses between 1999 and 2001. Libera maintained another account at CMC in his own name that was not open in 1998 and 1999 and sustained trading losses of over 130% in 2000. Libera's proprietary

trading accounts at CMC each sustained large losses in 2001 and the accounts had a combined trading loss of 141.59% for 2001.

### 3. Invertrust

#### a. Solicitation Fraud

54.     In or about March 2002, Libera began to fraudulently solicit persons to send funds to Invertrust by falsely representing to potential customers that he had produced substantial profits for customers of Asesoria Invertrust and Forinex.  Libera told potential customers of Invertrust that they would receive substantial returns based on the profits Libera had made from engaging in foreign currency futures transactions for his customers.

55.     Libera represented to potential customers that Invertrust was a new foreign currency trading firm that he had established in Miami, Florida.  Libera further represented that he would produce large profits for Invertrust customers by establishing individual foreign currency futures trading accounts in their names at Gain and use customer funds to trade futures on foreign currency.  Libera told customers that he would have full trading authority over their individual foreign currency futures accounts.

56.     Libera falsely represented to potential Invertrust customers that his customers had received profits in every month since 1998 and that customers of Invertrust would receive a minimum return on their investment of 2% each month.  Libera further represented that profits were assured because his trading expertise minimized any risk of loss.

57.     Libera represented to some Invertrust customers that he established Invertrust in the United States and maintained all customer accounts at trading firms located in the United States because the trading accounts of customers of Asesoria Invertrust and Forinex had been frozen.  Libera told these customers that these funds were frozen by authorities in the United Kingdom because of problems with one customer and that conducting Invertrust's trading

operations solely in the United States would avoid customer funds being frozen.  In fact, Libera's representations were false because no funds of Asesoria Invertrust or Forinex customers were frozen by any government authority at this time.

58.     Libera provided some prospective Invertrust customers with a brochure reciting the purported trading profits received by customers of Asesoria Invertrust from 1998 to 2000. These brochures stated that Asesoria Invertrust had achieved profits for its customers of 35.31% in 1998, 41.10% in 1999, and 16.76% in 2000.  Libera told Invertrust customers that these profits were the result of his trading futures on foreign currency on behalf of Asesoria Invertrust customers.

59.     Libera provided prospective Invertrust customers with an "Advisory Services Agreement" ("Invertrust Agreement").  The Invertrust Agreement stated that Invertrust is engaged in the business of making trading decisions on behalf of investors in the purchase and sale of foreign exchange currencies and related over-the-counter options contracts.

60.     The Invertrust Agreement provided that Invertrust would establish and maintain a foreign currency trading account in the customer's name at a futures commission merchant registered with the CFTC.  The Invertrust Agreement further provided that Invertrust would have sole authority to execute foreign currency transactions in the trading account.

61.     The Invertrust Agreement stated that Invertrust customers would pay Invertrust a monthly incentive fee equal to a percentage of the trading profits in the account.  According to the Invertrust Agreement, Invertrust customers agreed to pay Invertrust a fee equal to 20% of the first 2.5% of new trading profits and 80% of profits over 2.5% generated each month.

62.     As part of his solicitations, Libera provided prospective Invertrust customers with Invertrust Agreements and told them to sign them.  Libera represented to Invertrust customers that he would establish a foreign currency futures trading account in the customer's name at Gain

20

and that the trading account would be used exclusively for the customer's transactions. Libera further represented to customers that he would handle all the trading in the accounts at Gain.

### b.   Customer Deposits

63.   In September 2001, Libera established an account in the name of Invertrust at Intercredit Bank in Miami, Florida. All deposit and withdrawal activity in the Invertrust account at Intercredit Bank occurred between June 28, 2002 and February 26, 2004. Libera closed the Invertrust account at Intercredit Bank in May 2004. During this time, Libera instructed Invertrust customers to send funds to the Invertrust account at Intercredit Bank. Libera represented to customers that their funds would then be transferred to individual foreign currency futures trading accounts in their names at Gain for the purpose of conducting foreign currency futures transactions.

64.   During the period June 28, 2002 through February 26, 2004, a total of $2,062,722.38 was deposited into the Invertrust account at Intercredit Bank. Of that amount, $532,167 represented transfers between bank accounts in the name of Asesoria Invertrust or Forinex. Virtually all of the remaining $1,530,555 represented initial deposits by individuals and entities that were Invertrust customers.

### c.   Misappropriation of Funds

65.   During the period June 28, 2002 through February 26, 2004, a total of $2,062,722 was disbursed from the Invertrust account at Intercredit Bank. Libera misappropriated virtually all of those funds. Of the $2,062,722 total disbursements, $651,049 were payments made to Libera, $143,000 were payments made to Libera's wife, $144,725 were payments made for personal items such as automotive and watercraft purchases, $265,000 were transfers to the foreign currency trading account controlled by Libera at CMC in the name of Asesoria Invertrust, and $537,505 related to transfers between bank accounts in the name of Asesoria

Invertrust or Forinex. Of the remaining $321,443, $168,316.61 were payments made to Invertrust customers that Libera falsely represented were profits from their individual foreign currency futures trading accounts.

66.     Contrary to his oral and written representations to Invertrust customers, Libera did not establish individual foreign currency futures trading accounts at Gain. Instead, Libera misappropriated Invertrust customer funds by transferring a portion of those funds to his proprietary trading accounts at CMC, several accounts at Gain in his name, several accounts in the name of Forinex, and several accounts in the name of Invertrust.

67.     Libera transferred $265,000 from the Invertrust account at Intercredit Bank to his proprietary trading account at CMC in the name of Asesoria Invertrust. As previously alleged, Libera used this account to misappropriate customer funds.

68.     Libera also misappropriated Invertrust customer funds by transferring a portion of those funds to his proprietary trading accounts at Gain. Between May and August 2002, Libera established three foreign currency trading accounts in the name of Invertrust at Gain. Libera was the only authorized trader for these accounts.

69.     Libera conducted trading in the Gain Invertrust accounts at Gain between May 2002 and November 2002. Libera deposited a total of $1,027,000 in the three accounts and incurred total trading losses of $548,950. During the time the accounts were open, Libera withdrew $475,000 and transferred those funds to bank accounts under his control.

70.     Libera misappropriated a portion of Invertrust customer funds by engaging in a Ponzi scheme. He transferred customer funds from the Invertrust accounts, the Forinex accounts, and his personal trading accounts at Gain to bank accounts under his control and used some of those funds to pay Invertrust customers purported high returns on their investments.

Libera falsely represented to Invertrust customers that the payments were from profits on foreign currency futures trading when, in fact, the payments were from other customers' funds.

71.     Libera also misappropriated customer funds by transferring a portion of those funds to his personal banking accounts at Washington Mutual Bank in Aventura, Florida ("Washington Mutual") and Citibank Florida FSB in Miami, Florida ("Citibank") and then further transferring those funds to a personal foreign currency trading account in his name at FX Solutions LLC ("FX Solutions"), a trading firm located in Ridgewood, New Jersey.

72.     In September 2003, Libera established a foreign currency trading account in his name at FX Solutions. Libera was the only authorized trader for this account and had sole control over the funds in the account.

73.     Libera conducted trading in his personal account at FX Solutions between September 2003 and January 2004. Libera deposited a total of $135,400 of Invertrust customers funds in the account and incurred trading losses of $70,683. During the time the account was opened, Libera withdrew $64,440 and transferred those funds to bank accounts under his control.

74.     Libera additionally misappropriated Invertrust customer funds by using them to pay his personal expenses and for purposes unrelated to foreign currency trading. Libera obtained these funds from the trading accounts under his control at Gain and from bank accounts under his control into which he had deposited funds received from Invertrust customers.

        c.     **False Trading Reports**

75.     Libera made material oral and written misrepresentations to Invertrust customers about profits and risk of loss in their purported individual foreign currency futures trading accounts at Gain. Libera falsely represented to customers of Invertrust that their individual foreign currency futures trading accounts were generating large profits. Libera further misrepresented that his trading expertise minimized any risk of loss.

76.     In order to conceal that he had not established individual foreign currency futures trading accounts and had not produced the large trading profits that he had represented to customers, Libera disseminated false account statements to Invertrust customers showing profitable returns.  These statements were false because Libera did not establish individual foreign currency trading accounts for Invertrust customers at Gain or at any other trading firm.

77.     In addition to disseminating false monthly trading statements, Libera provided potential Invertrust customers with fraudulent documents showing that Asesoria Invertrust customers had received consistent monthly profits from 1998 through 2001 amounting to large annual returns.  As previously alleged, these documents falsely showed that Asesoria Inverturst customers had received trading profits of 35.31% in 1998, 41.10% in 1999, and 16.76% in 2000.  These profit percentages are fictitious because no individual foreign currency futures trading accounts were ever established for Aseoria Invertrust customers.  Moreover, to the extent that Libera wrongly used customer funds to engage in foreign currency transactions by depositing those funds into his proprietary trading accounts, the results of the trading were contrary to the false reports he gave customers.  From May 2002 through November 2002, Libera sustained large trading losses in his proprietary accounts at Gain.

### 4.     Misrepresentations of Frozen Customer Funds

78.     Beginning in early 2003, defendants engaged in further misrepresentations to customers to conceal their misappropriation of customer funds.  At this time and continuing to the present, Libera falsely told customers of Asesoria Invertrust, Forinex, and Invertrust that their funds had been frozen by the United States government.

79.     Libera misrepresented to some customers that the United States government had frozen all customer funds as a result of a government investigation of Forinex pursuant to the

USA Patriot Act.  Libera's representations were false because at no time did the United States government freeze customer funds deposited with Asesoria Invertrust, Forinex, or Invertrust.

80.     Libera provided some customers with a fictitious written decision falsely representing that the Financial Crimes Enforcement Network of the United States Department of the Treasury had assessed a civil monetary penalty against him.  Libera falsely told customers that the decision was the reason that customer funds were frozen.

81.     Libera's oral and written representations to customers that their funds were frozen by the United States government were false and were made with the intent to deceive customers about the location of their funds.  At the time that Libera falsely made these representations, he had misappropriated and was misappropriating customer funds.

**C.     Libera Offered Illegal Off-Exchange Commodity Futures Contracts**

82.     Libera solicited persons to enter into agreements for the purchase and sale of illegal off-exchange foreign currency futures contracts.

83.     Libera represented to customers that he traded futures on foreign currency for customers.  Libera also represented to customers that he would trade futures on foreign currency by establishing trading accounts in the names of customers and executing futures trades on behalf of the customers.  Libera entered into written agreements with customers authorizing him to execute foreign currency transactions on behalf of customers and represented to customers that the written agreements provided that he would establish individual foreign currency futures trading accounts at large trading firms.

84.     In addition to representing to customers that he was offering and agreeing to conduct foreign currency futures transactions on behalf of customers, the foreign currency transactions that Libera agreed to execute on behalf of customers were agreements for

transactions that contained all the characteristics of futures contracts. Libera offered customers foreign currency transactions that entailed the purchase or sale of commodities for future delivery at prices or using pricing formulas that were established at the time the contracts were initiated. Libera represented to customers that the contracts could be fulfilled through offset, cancellation, cash settlement or other means to avoid delivery. Neither Libera, nor his companies, nor customers had any commercial need for foreign currency. At no time did Libera, his companies, or customers anticipate taking or in fact take delivery of foreign currencies. Instead, Libera represented to customers that they would enter into foreign currency transactions to speculate and profit from anticipated price fluctuations in the markets for these currencies.

85.     Libera did not offer, sell, enter into, confirm the execution of, and/or conduct his business of soliciting, accepting any order for or otherwise dealing in off-exchange foreign currency contracts in connection with foreign currency futures transactions on or subject to the rules of a board of trade that has been designated by the CFTC as a contract market or derivatives transaction facility, nor were any of these transactions executed or consummated by or through a member of such a contract market or derivatives transaction execution facility.

86.     Section 2(c)(2)(B)(i) and (ii) of the Act, 7 U.S.C. § 2, provides that the CFTC shall have jurisdiction over an agreement, contract or transaction in foreign currency that is: (i) a contract of sale of a commodity for future delivery or an option; and (ii) is offered to, or entered into with, a person that is not an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, is a regulated entity as specified in Section 2(c)(2)(B)(ii) of the Act, 7 U.S.C. § 2.

87.     Libera offered and/or entered into foreign currency futures transactions and agreements with his customers. At least some, if not all, of Libera's customers were not eligible

contract participants and none of the defendants is a proper counterparty for retail foreign currency futures transactions.

V.

<u>CONCLUSIONS OF LAW</u>

**A.     Libera Committed Fraud In Connection With Futures Transactions**

88.     From at least December 21, 2000 to at least the filing of the Complaint, Libera, in or in connection with the orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made, for or on behalf of any other persons, where such contracts for future delivery were or could be used for the purposes set forth in Section 4b(a) of the Act, 7 U.S.C. § 6b(a), cheated or defrauded or attempted to cheat or defraud customers or prospective customers, willfully made or caused to be made false statements to customers or prospective customers, and willfully deceived or attempted to deceive customers or prospective customers by, among other things, misrepresenting the profits and risks associated with commodity futures trading and misappropriating customer funds, all in violation of Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2), and Regulation 1.1(b), 17 C.F.R. § 1.1(b).

**B.     Libera Solicited Illegal Off-Exchange Futures Contracts**

89.     From at least December 21, 2000 to at least the filing of the Complaint, Libera offered to enter into, entered into, executed, confirmed the execution of, or conducted an office or business in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in transactions in, or in connection with, a contract for the purchase or sale of a commodity for future delivery when: (a) such transactions were not conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity, and (b) such

contracts were not executed or consummated by or through a member of such contract market in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a)

## VI.

## <u>PERMANENT INJUNCTION</u>

**A.     IT IS HEREBY ORDERED** that Libera is permanently restrained, enjoined, and prohibited from directly or indirectly:

1.      Cheating or defrauding or attempting to cheat or defraud other persons and willfully deceiving or attempting to deceive other persons in or in connection with the orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made, for or on behalf of any other persons, where such contracts for future delivery were or could be used for the purposes set forth in Section 4b(a) of the Act, 7 U.S.C. § 6b(a), by willfully making or causing to be made false statements to customers or prospective customers, and willfully deceiving or attempting to deceive customers or prospective customers by misrepresenting the profits and risks associated with commodity futures trading, issuing false reports, or misappropriating customer funds in violation of Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2), and Regulation 1.1(b), 17 C.F.R. § 1.1(b); and

2.      Offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in transactions in, or in connection with, a contract for the purchase or sale of a commodity for future delivery when: (a) such transactions have not been conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity, and (b) such contracts have not been executed or consummated by or through a member of such contract market, in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a).

**B.     IT IS HEREBY FURTHER ORDERED** that Libera is permanently restrained, enjoined, and prohibited from directly or indirectly engaging in any activity related to trading in any commodity, as that term is defined in Section 1a(4) of the Act, 7 U.S.C. § 1a(4) ("commodity interest"), except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), for any reason other than personal investment of Libera's own funds including, but not limited to, the following:

1. Trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29);

2. Engaging in, controlling, or directing the trading of any futures or options accounts for or on behalf of any other person or entity, whether by power of attorney or otherwise;

3. Soliciting or accepting any funds from any person in connection with the purchase or sale of any commodity interest contract;

4. Placing orders or giving advice or price quotations, or other information in connection with the purchase or sale of commodity interest contracts for themselves and others, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9);

5. Introducing customers to any other person engaged in the business of commodity interest trading;

6. Issuing statements or reports to others concerning commodity interest trading, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9);

7. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9), or acting as a principal, agent, officer or employee of any person registered, required to be registered, or exempted from registration, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

8. Engaging in any business activities related to commodity interest trading, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

**C.    IT IS HEREBY FURTHER ORDERED** that Libera is restrained and enjoined from directly or indirectly destroying, mutilating, erasing, altering, concealing, or disposing of, in any manner, any documents that relate to the named defendants in this proceeding.

**D.    IT IS HEREBY FURTHER ORDERED** that the injunctive provisions of this Order shall be binding upon Libera, any person insofar as he or she is acting in the capacity of officer, agent, servant, or attorney of Libera, and any person who receives actual notice of this Order by

personal service or otherwise insofar as he or she is acting in active concert or participation with Libera.

**VII.**

**RESTITUTION, CIVIL MONETARY PENALTY, AND ANCILLARY RELIEF**

**IT IS HEREBY ORDERED** that Libera shall comply fully with the following terms, conditions and obligations relating to the payment of restitution and the submission of financial information.

**A.    RESTITUTION**

1.      Libera shall make restitution in the amount of $5,455,722.68,[1] plus pre-judgment interest in the amount of $343,996.73,[2] for a total of $5,799,719.41, plus post-judgment interest at the interest rate of 5.03%.[3]  Libera shall make restitution immediately upon entry of this Order.  The amount of restitution represents the amount of funds that persons deposited into bank accounts in the name of Asesoria Invertrust, Forinex, and Invertrust as a result of the course of illegal conduct alleged in the Complaint less the amount of funds paid to customers from those bank accounts.  The amounts of restitution shall not limit the ability of any customer from proving that a greater amount is owed, and nothing herein shall be construed in any way to limit

---

[1]  A default judgment may be entered when the amount claimed is a liquidated sum or one capable of mathematical calculation.  *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979); *SEC v. Smyth*, 420 F.3d 1225, 1231-32 (11th Cir. 2005).  *See* Declaration of Ralph L. White Jr., Certified Public Accountant and Associate Director at CFTC, DE 54.  The White Declaration sets forth a financial analysis of the evidence relating to the deposits made by customers into the bank accounts of the Corporate Defendants and the payments made to customers from those accounts.  Ex. B provides a detailed description of how this sum was computed.

[2]  The CFTC calculated prejudgment interest using the standard underpayment rates established quarterly by the Internal Revenue Service pursuant to 26 U.S.C. § 6621(a)(2) beginning from January 1, 2006, the first day of the month after the Complaint was filed, to October 31, 2006.

[3]  The federal interest statute, 28 U.S.C.A. § 1961, governs an award of post-judgment interest in cases arising out of federal court. *Mitchell Energy Corp. v. Samson Resources Co.,* 80 F.3d 976 (5th Cir. 1996).  28 U.S.C.A. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." That rate is 5.03%.

or abridge the rights of any customers of Libera, Asesoria Invertrust, Forinex, or Invertrust that exist under state or common law.

**2.** The amount of restitution directed under the order shall be reduced by any payments made by Libera pursuant to the restitution order in *U.S. v. Libera*, 05-60322-CR-DIMITROULEAS (S.D. FL. Apr. 27, 2006).

**3.** Restitution payments under this Order shall be made to the U.S. Clerk's Office, Financial Section, 301 N. Miami, Florida 33128 and administered in accordance with the restitution procedures directed by the Court in *U.S. v. Libera*, No. 05-60322-CR-DIMITROULEAS (S.D. Fla. judgment entered Apr. 27, 2006). Libera shall notify the CFTC of any restitution payment with a letter that identifies his name and the name and docket number of this proceeding and the amount of the payment, and shall transmit the letter and a copy of the form of payment to the Office of Cooperative Enforcement, Division of Enforcement, CFTC, 1155 21st N.W., Washington, D.C. 20581.

**B.    DISGORGEMENT**

**1.** Libera shall disgorge amount of $5,455,722.68, plus pre-judgment interest in the amount of $343,996.73, for a total of $5,799,719.41, plus post-judgment interest at the interest rate of 5.03%. Libera shall make disgorgement immediately upon entry of this Order. The amount of disgorgement represents the amount of benefits received as measured by the amount of funds that persons deposited into bank accounts maintained by Asesoria Invertrust, Forinex, and Invertrust as a result of the course of illegal conduct alleged in the Complaint less the amount of funds paid to customers from those bank accounts.

**2.** Disgorgement payments under this Order shall be made to the U.S. Clerk's Office, Financial Section, 301 N. Miami, Florida 33128 and administered in accordance with the restitution procedures directed by the Court in *U.S. v. Libera*, No. 05-60322-CR-

31

DIMITROULEAS (S.D. Fla. judgment entered Apr. 27, 2006). Libera shall notify the CFTC of any disgorgement payment with a letter that identifies his name and the name and docket number of this proceeding and the amount of the payment, and shall transmit the letter and the form of payment to the Office of Cooperative Enforcement, Division of Enforcement, CFTC, 1155 21st N.W., Washington, D.C. 20581.

3.      The disgorgement amount for Libera will be reduced by the amount of any payment made by him toward his restitution obligation herein or his restitution obligation in pursuant to the restitution order in *U.S. v. Libera*, 05-60322-CR-DIMITROULEAS (S.D. FL. Apr. 27, 2006).

**C.    CIVIL MONETARY PENALTY**

Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, judgment is entered against Libera as of the date of this Order for a civil monetary penalty in the amount of $16,396,067.91, plus post-judgment interest at an interest rate of 5.03%. In accordance with Section 6c of the Act, 7 U.S.C. § 13a-1, the amount of the civil monetary represents triple the monetary gain received by Libera as measured by triple the amount of customer funds received by Libera personally and through the companies he controlled, Asesora Invertrust, Forinex, and Invertrust, and not returned to customers. No funds shall be applied to the civil monetary penalty until Libera has fully satisfied his restitution and disgorgement obligations. Libera shall pay this penalty by making electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order made payable to the CFTC and sent to the attention of the Office of Cooperative Enforcement, Division of Enforcement, CFTC, 1155 21st Street, N.W., Washington, D.C. 20581. Libera shall accompany payment of the penalty with a cover letter that identifies Libera and the name and docket number of this proceeding. Libera shall simultaneously transmit a copy of the

cover letter and the form of payment to the Director, Division of Enforcement, CFTC, 1155 21st

N.W., Washington, D.C. 20581.

## D.    TRANSFER OF ASSETS

Libera shall not transfer, or cause others to transfer, funds or other property to the

custody, possession, or control of any members of his family or any other person or entity for the

purpose of concealing such funds from this Court or the CFTC until his restitution and civil

monetary penalty obligations have been satisfied under this Order.

## E.    DELIVERY OF DOCUMENTS

Libera shall immediately, or within such time as permitted by the CFTC, deliver to the

CFTC all documents in the possession and custody of Libera relating or referring to Asesoria

Invertrust, Forinex, or Invertrust, or any of the allegations of the complaint, including but not

limited to, all books and records of accounts, all financial and accounting records, balance sheets,

income statements, bank records (including monthly statements, canceled checks, records of wire

transfers, and check registers), client lists, title documents and other papers.

## F.    COOPERATION

Libera agrees to cooperate fully with the CFTC and any government agency seeking to

enforce the provisions of this Order in carrying out all duties with respect to his obligations to

pay restitution, disgorgement, and a civil monetary penalty.  Libera agrees to cooperate fully

with the CFTC and any government agency seeking to enforce the provisions of this Order in

explaining his financial income and earnings, status of assets, financial statements, asset transfers

and tax returns, and shall provide any information as may be required by the CFTC and any

government agency seeking to enforce the provisions of this Order.

## VIII.

### SCOPE OF ORDER

**A.**      **IT IS HEREBY ORDERED** that this Court shall retain jurisdiction of this cause to assure compliance with this Order and for all other purposes related to this action.  This Order shall be interpreted and enforced according to the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of Florida, and all provisions of the Act and CFTC Regulations relating or referring to the obligations hereunder.

**B.**      **IT IS HEREBY FURTHER ORDERED** that the following provisions shall apply to the terms and conditions of this Order:

1.     **Notices**:  All notices required by this Order shall be sent by certified mail, return receipt requested.  Libera shall provide the CFTC with written notice of all changes to his contact telephone number(s) and/or mailing address(es) within ten (10) calendar days of the change(s).

2.     **Waiver**:  The failure of any party to this Order or of any investor at any time to require performance of any provision of this Order shall in no manner affect the right of the party or investor to enforce the same or any other provision of this Order at a later time.  No waiver in one or more instances of the breach of any provision contained in this Order shall be deemed or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Order.

3.     **Acknowledgements**:  Upon being served with a copy of this Order after entry by this Court, Libera shall sign an acknowledgment of service and serve the acknowledgment on this Court and the CFTC within seven (7) calendar days.

Upon being served with a copy of this Order after entry by the Court, the CFTC

shall serve a copy of the Order upon the NFA within seven (7) calendar days.

4.    **Invalidation**:  If any provision, or the application of any provision of this Order,

is held invalid, the remainder of this Order and the application of the provision to

any other person or circumstance shall not be affected by the holding.

5.    **Integration**:  This Order incorporates all of the terms and conditions of the

settlement of the parties to this Order.  Nothing shall serve to amend or modify

this Order in any respect, unless:  (1) reduced to writing; (2) signed by all parties

hereto; and (3) approved by order of this Court.

According, it is hereby

ORDERED AND ADJUDGED Plaintiff's Motion For Entry of Order of Final

Judgment by Default Against Defendant Carlos Alejandro Libera Saume For

Permanent Injunction and Setting Amounts For Restitution, Disgorgement, and

Civil Monetary Penalties is GRANTED [DE 53].  This case is closed.  Any

pending motions are denied as moot.

**Done and Ordered this ___15th___ day of November, 2006, at Fort Lauderdale,**

**Florida.**


_____
**KENNETH A. MARRA**
**UNITED STATES DISTRICT JUDGE**

cc:    Richard Foelber, Esq.

        Carlos Alejandro Libera Saume
        Inmate # 57446-004
        Moshanon Valley Correctional Institution
        Phillipsburg, PA  16866